JAYASHRI SRIKANTIAH (CA Bar No. 189556)
LISA WEISSMAN-WARD (CA Bar No. 298362)
TRUMAN CHEN (CA Bar Student Certification No. 00963658)
IMMIGRANTS' RIGHTS CLINIC
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone:  (650) 724.2442
Facsimile:  (650) 723.4426
jsrikantiah@law.stanford.edu

On Behalf of Plaintiff,
Immigrant Legal Defense

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### (San Francisco Division)

| | |
|---|---|
| IMMIGRANT LEGAL DEFENSE,<br><br>            Plaintiff,<br><br>      v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,<br><br>            Defendants. | Case No.<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. § 552** |

Case No.

**INTRODUCTION**

1. For over ten years, Defendants, the Department of Homeland Security ("DHS") and United States Immigration and Custom Enforcement ("ICE"), have produced, stored, and disseminated hundreds – if not thousands – of videos of noncitizens that DHS and ICE recorded during ICE enforcement actions. There is no indication of noncitizens' consent. The noncitizens in these videos are filmed in highly sensitive and compromising situations, including ICE arrests inside homes, ICE raids of workplaces, and incarceration in immigration detention facilities. On their website, DHS and ICE state that they have produced such videos for the purpose of public consumption and "entertainment value."

2. Any member of the public can currently find and download high-definition videos of immigration enforcement actions that feature unblurred faces of noncitizens and other identifiers like close-up shots of tattoos, fingerprints, legible license plates, and even noncitizens' home addresses. ICE's public dissemination of their videos places vulnerable noncitizens and their families at risk of grave reputational and physical harm. For example, an ICE video's disclosure of an asylum seeker's personal identifiers could lead to persecution of that noncitizen or their family.

3. What is known about DHS and ICE's recording program is dwarfed by the sheer size of what has been kept from view. The public knows next to nothing about the full number of unedited recordings; who has access to the recordings; where the recordings are stored; or how the recordings are used by and exchanged between government and private entities. DHS and ICE's near-total lack of transparency makes it effectively impossible to hold Defendants accountable for practices that potentially constitute systematic violations of noncitizens' privacy interests.

4. Impacted noncitizens, their families and communities, and the broader public have an urgent need to learn how DHS and ICE produce, store, and disseminate their vast collection of video recordings. This push for transparency is also informed by DHS and ICE's history of misconduct. Just months ago, institutional and media reports revealed how ICE officers have repeatedly misused

ICE data to privately harass and surveil others.[1] These reports underscore how a lack of public oversight of DHS and ICE's handling of sensitive materials endangers the privacy interests of citizens and noncitizens alike.

5.      Plaintiff, Immigrant Legal Defense ("ILD"), filed two interrelated requests under the Freedom of Information Act ("FOIA") on May 2, 2023 for (1) records of ICE's video recording practices and (2) video and audio recordings of ICE enforcement actions in California between September 28, 2020 and October 2, 2020. Both requests were precisely worded to produce a manageable number of documents. Defendants violated FOIA by failing to produce even a single responsive document to Plaintiff's requests. Plaintiff's requests have been pending for seven months, compelling ILD to file this lawsuit concerning both requests.

## JURSIDICTION

6.      This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B). This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-06.

## VENUE

7.      Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B) as Plaintiff has its principal place of business in this district.

## DIVISIONAL ASSIGNMENT

8.      Assignment to the San Francisco/Oakland Division is proper pursuant to Civil Local Rules 3-2(c) and (d), because a substantial part of the events which give rise to the claims occurred in Alameda County. Plaintiff has its principal place of business in Oakland.

## PARTIES

9.      Plaintiff, Immigrant Legal Defense ("ILD"), is a non-profit agency dedicated to promoting justice and fostering systemic change through the provision of free legal services to

---

[1] *See, e.g.*, Jake Wiener, *New ICE Privacy Impact Assessment Shows All the Ways the Agency Fails to Protect Immigrants' Privacy*, Electronic Privacy Information Center (Apr. 20, 2023), https://epic.org/new-ice-privacy-impact-assessment-shows-all-the-way-the-agency-fails-to-protect-immigrants-privacy/; Dhruv Mehrotra, *ICE Records Reveal How Agents Abuse Access to Secret Data*, WIRED (Apr 17, 2023, 7:00 AM), https://www.wired.com/story/ice-agent-database-abuse-records/.

underserved immigrant communities across California. Together, ILD's attorneys, legal assistants, and staff have represented thousands of unaccompanied minors, families seeking asylum, and detained and non-detained individuals facing removal from the United States. They have also provided individual and class-wide representation to noncitizens demanding increased rights and protections for immigrants. In addition to representing noncitizens in individual and class-wide cases, ILD also collaborates with other legal service providers and community organizers on advocacy related to local, regional, statewide, and national immigrant law and policy. ILD also regularly offers technical assistance, legal training, and public education on immigration-related topics to other immigration advocates as well as members of the public. Because of its innovative programs and partnerships, ILD is recognized as a national model for both the delivery of critical legal services and advocacy. As part of its mission to serve vulnerable communities in California, ILD engages in efforts to ensure transparency by immigration agencies. ILD intends to share records obtained through these FOIA requests with the public at no cost.

10. Defendant, the United States Department of Homeland Security ("DHS"), is a federal agency within the meaning of 5 U.S.C. § 552(f) and is tasked with administering and enforcing federal immigration laws. Defendant, Immigration and Customs Enforcement ("ICE"), is a sub-agency within DHS responsible for immigration enforcement. Upon information and belief, DHS and ICE play a significant role in the production, storage, and dissemination of the requested recordings, and have the requested records in their possession, custody, or control.

**FACTS**

**I.     DHS AND ICE PRODUCE, STORE, AND DISSEMINATE SENSITIVE VIDEOS OF NONCITZENS FOR PUBLIC CONSUMPTION AND ENTERTAINMENT VALUE WITHOUT CONSENT.**

11. A webpage hosted by DHS and ICE entitled "ICE, Camera, Action!" explains that ICE creates video productions through its Office of Television and Motion Pictures "typically for informational purposes and entertainment value."[2] On its webpage, ICE describes its video

---

[2] *ICE, CAMERA, ACTION!*, U.S. Immigr. and Customs Enf't, https://www.ice.gov/topics/ice-camera-action [https://perma.cc/FR82-VL8X].

1  productions as categorically separate from the work that contributes to ICE's "first priority": "[t]he

2  success of law enforcement work."[3] ICE explains that its video productions originate from its interest

3  in serving "the public's appetite for consuming law enforcement storylines."[4]

4       12.     Within DHS, the relevant office is the Office of Multimedia, Motion Pictures and

5  Television, housed under the Office of Public Affairs ("DHS OPA").[5] Within ICE, the relevant office

6  is the Office of Television and Motion Pictures, likely housed under the ICE Office of Public Affairs

7  ("ICE OPA").[6] ICE's videography operations have operated for at least thirteen years.[7] ICE's

8  internal videographers are employed under ICE OPA.[8] External videographers – not employed within

9  either DHS or ICE – work under contracts between DHS's Office of Multimedia and a production

10 company. An example of a contracted videographer would be one working on behalf of a company

11 like Netflix, under contract with DHS for a documentary featuring immigration enforcement.[9]

12      13.     ICE disseminates edited portions of footage recorded by internal videographers by

13 publishing them on a website hosted by the U.S. Department of Defense: the Defense Visual

14 Information Distribution Service ("DVIDS," https://dvidshub.net). Media posted to DVIDS is

15 "considered public domain and is free to use unless otherwise specified."[10] Since 2010, ICE has

16 uploaded over 400 video clips to DVIDS, and it is through DVIDS that ICE also shares recordings to

---

[3] *Id.*

[4] *Id.*

[5] *Office of Multimedia*, U.S. Dep't of Homeland Sec., https://www.dhs.gov/office-multimedia.

[6] *ICE, CAMERA, ACTION!*, U.S. Immigr. and Customs Enf't, *supra* note 2; *Office of Public Affairs*, U.S. Immigr. and Customs Enf't, https://www.ice.gov/leadership/opa.

[7] Videos uploaded by ICE to DVIDS date back to at least 2010. *See, e.g.*, *ICE Secure Communities*, DVIDS, https://www.dvidshub.net/video/119681/ice-secure-communities (Mar. 31, 2010).

[8] Decl. of M.J. at 4, *Kidd v. Mayorkas*, No. 220-cv-03512 (Sept. 14, 2021).

[9] *See, e.g.*, Caitlin Dickerson, *A Rare Look Inside Trump's Immigration Crackdown Draws Legal Threats*, N.Y. Times (updated Feb. 1, 2021), https://www.nytimes.com/2020/07/23/us/trump-immigration-nation-netflix.html; *see also DHS Multimedia Agreement Documentary Format 2020*, U.S. Dep't of Homeland Sec., https://www.dhs.gov/sites/default/files/publications/20_0819_opa_dhs-multimedia-agreement-documentary-productions.pdf [https://perma.cc/926K-VCCN].

[10] *Media Special Access*, DVIDS, https://www.dvidshub.net/mediarequest.

their social media pages. [11] Upon information and belief, there are additional videos beyond those that are on DVIDS.

14.     The videographers employed and contracted by DHS and ICE "ride along," or accompany agents, on Enforcement and Removal Operations ("ERO") actions. The ERO actions that appear in publicly available videos posted to DVIDS include: arresting noncitizens inside their homes; raiding work-places; boarding noncitizens onto deportation flights; and fingerprinting and processing noncitizens inside immigration detention facilities. The videographers produce a significant number of video recordings from these ERO actions.

15.     DHS and ICE have uploaded videos from ERO actions that reveal faces, personal information, and other identifiers of noncitizens. To provide a few examples from videos recorded in California: ICE failed to blur the faces of four noncitizens during four separate arrests across two videos, from 2011 and 2016. [12] In another video from 2020, ICE decided to no longer blur three noncitizens' faces once they wore medical face-masks, despite their faces and features still being highly recognizable. [13] In addition, ICE at times failed to blur clearly legible license plates near or even directly in front of targeted noncitizens' residences. [14] Elsewhere, videos include detailed discussions of noncitizens' criminal histories; lengthy segments studying noncitizens' tattoos; a noncitizen's T-shirt that potentially discloses their employer; and close-up shots of noncitizens'

---

[11] *See U.S. Immigration and Customs Enforcement*, DVIDS, https://www.dvidshub.net/unit/ICE.

[12] *Rancho San Pedro Gang Enforcement Part Three*, DVIDS, https://www.dvidshub.net/video/120938/rancho-san-pedro-gang-enforcement-part-three, at 00:33, 02:10 (Apr. 28, 2011); *ICE arrests 36 fugitives across US during Operation Safe Nation and Operation No Safe Haven III*, DVIDS, https://www.dvidshub.net/video/484451/ice-arrests-36-fugitives-across-use-during-operation-safe-nation-and-operation-no-safe-haven-iii, at 01:08 (Sept. 20, 2016).

[13] *DHS announces ICE enforcement actions on criminal aliens released due to California sanctuary policies*, DVIDS, https://dvidshub.net/video/768708/dhs-announces-ice-enforcement-actions-criminal-aliens-released-due-california-sanctuary-policies, at 01:59, 02:40, 04:14 (Oct 1, 2020).

[14] *Rancho San Pedro Gang Enforcement Part One*, DVIDS, https://dvidshub.net/video/120879/rancho-san-pedro-gang-enforcement-part-one, at 03:04 (Apr. 28, 2011); *Rancho San Pedro Gang Enforcement Part Three*, DVIDS, *supra* note 12, at 00:08, 00:23; *Project Shadowfire – B—roll—California*, https://www.dvidshub.net/video/456015/project-shadowfire-b-roll-california, at 00:52 (Mar. 28, 2016).

Case No.

fingerprints upon arriving at detention facilities.[15]  Every exposure of identifiers heightens the risk of impacted noncitizens being identified by, for example, an employer or landlord.

16.    Notably, one video from 2015 zooms in on the cross-street signs right outside of a targeted noncitizen's residence, on which the home address number is also unblurred.[16] Given that ICE specifies Orange County as the locale in the video, this information enables anyone familiar with online mapping tools to locate the noncitizen's house in the video within a matter of seconds—along with all the public records that may be attached to a certain address.

17.    The webpage for another video from 2011 features a lengthy description that reveals seven arrested noncitizens' names, ages, criminal histories, places of residence, and countries of origin.[17] Ex. E. At the time of this filing, the video on this webpage has been played 644 times and downloaded in high-resolution 146 times.

18.    The disclosures of information identified in ¶¶ 15-17 may pose a grave threat to the safety of noncitizens in DHS and ICE videos who have or had asylum applications. DHS has itself emphasized that the stringent confidentiality protections for asylum applicants under 8 C.F.R. § 208.6 "safeguard[] information that, if disclosed publicly, could subject the claimant to retaliatory measures by government authorities or non-state actors in the event that the claimant is repatriated, or endanger the security of the claimant's family members who may still be residing in the country of origin."[18] For example, it is well-established that non-state actors such as organized cartels persecute and

---

[15] *See, e.g.*, *DHS announces ICE enforcement actions on criminal aliens released due to California sanctuary policies*, DVIDS, *supra* note 13, at 00:28, 02:08, 04:50 (discussing noncitizens' criminal histories); *LA Area Street Gang Arrests*, DVIDS, https://www.dvidshub.net/video/469102/la-area-street-gang-arrests, at 01:36 (June 14, 2016) (examining tattoos); *Operation Cross Check 2015*, DVIDS, https://www.dvidshub.net/video/393337/operation-cross-check-2015, at 02:32 (Mar. 1, 2015) (showing noncitizen possibly wearing their employer's company T-shirt); *Nationwide Foreign Fugitive Sweep*, DVIDS, https://dvidshub.net/video/407737/nationwide-foreign-fugitive-sweep, at 03:55 (June 2, 2015) (recording fingerprinting process in an immigration detention facility).

[16] *Operation Cross Check 2015*, *supra* note 15, at 01:34.

[17] *Operation Cross Check San Jose*, DVIDS, https://www.dvidshub.net/video/139097/operation-cross-check-san-jose (Dec. 13, 2011).

[18] U.S. Customs & Immigr. Servs. Asylum Div., U.S. Dep't of Homeland Sec., *Fact Sheet: Federal Regulation Protecting the Confidentiality of Asylum Applicants* (2012), https://www.uscis.gov/sites/default/files/document/fact-sheets/Asylum-ConfidentialityFactSheet.pdf.

torture individuals, empowered by sophisticated technological capabilities.[19] For asylum applicants in DHS and ICE videos, the exposure of personal identifiers can be a matter of life and death.

19.     All of the above exposures of noncitizen's identities and information contained in ¶¶ 15-17 were found in the fraction of videos on DVIDS that were recorded in California— approximately 10 per cent of the total currently uploaded by ICE. Upon information and belief, comparable exposures exist throughout the remaining 90 per cent of videos that feature ICE's enforcement on a national scale.

## II.     DHS AND ICE HAVE PROVIDED LITTLE TO NO INFORMATION ON THEIR PROCEDURES FOR PRODUCING, STORING, AND DISSEMINATING AUDIOVISUAL RECORDINGS OF NONCITIZENS.

20.     The public has minimal insight into basic questions of how DHS and ICE produce, store, and disseminate their video recordings. Plaintiff's FOIA requests seek to answer preliminary questions, such that the public may have the facts that they need regarding DHS and ICE's pervasive yet shrouded videography practices.

21.     Regarding DHS and ICE's production of videos, the FOIA requests seek: how many video recordings are there in total? How many noncitizens are in these recordings? How many people appear in the background of these videos? Who are the external entities who have contracted with DHS and ICE to conduct videography work? What protective procedures do DHS and ICE enforce when external videographers film enforcement actions and other invasive sensitive situations?

22.     Regarding DHS and ICE's storage of videos, the FOIA requests seek: where are recordings and associated metadata stored? Who has access to these recordings? How do DHS and ICE monitor and authorize access to these recordings? Do other offices within DHS or agencies within the federal government have access to the recordings?

23.     Regarding DHS and ICE's dissemination of videos, the FOIA requests seek: who decides what parts of the recordings are shared? Who decides the manner in which the recordings are used? Do DHS and ICE use the video recordings for any additional purposes beyond "public

---

[19] *See, e.g.*, *Hermosillo v. Garland*, 80 F.4th 1127 (9th Cir. 2023); Cecile Schilis-Gallego and Nina Lakhani, "'*It's a free-for-all': how hi-tech spyware ends up in the hands of Mexico's cartels*," The Guardian (Dec. 7, 2020), https://www.theguardian.com/world/2020/dec/07/mexico-cartels-drugs-spying-corruption.

1  information and entertainment value"? What procedural safeguards and guidelines are in place to

2  ensure responsible use of the recordings and their data?

3       24.     The records responsive to the FOIA requests will enable the general public to assess

4  whether DHS and ICE officers act in a manner consistent with agency directives and state and federal

5  laws. For example, DHS's Directive 047-01, "Privacy Policy and Compliance," specifies that "DHS

6  should involve the individual in the process of using PII [Personally Identifiable Information] and, to

7  the extent practicable, seek individual consent for the collection, use, dissemination, and maintenance

8  of PII."[20] The Directive further prescribes that "DHS should protect PII (in all media) through

9  appropriate security safeguards against risks such as loss, unauthorized access or use, destruction,

10  modification, or unintended or inappropriate disclosure."[21] DHS and ICE are also required under the

11  Privacy Act to "Maintain Only Relevant and Necessary Information" as well as "Inform Individuals

12  when Asking to Collect Information." 5 U.S.C. § 552a(e)(1), (3).[22] Upon information and belief,

13  responsive records will clarify whether DHS and ICE are compliant with the mandates contained in

14  this paragraph.

15     **III.**    **DISCLOSURE OF DHS AND ICE'S RECORDS AND RECORDINGS ARE**
16             **URGENTLY NEEDED TO INFORM IMPACTED NONCITIZENS AND THE**
              **PUBLIC AT LARGE, ESPECIALLY IN LIGHT OF RECENTLY DISCLOSED**
17             **PRIVACY VIOLATIONS COMMITTED BY ICE IN OTHER CONTEXTS.**

18       25.     Recent reports of systematic violations of privacy committed by ICE officers misusing

19  internal databases in other contexts make the need for government transparency especially urgent and

20  timely. The possibility of similar misconduct involving DHS and ICE's practices surrounding the

21

22  [20] U.S. Dep't of Homeland Sec., https://www.dhs.gov/sites/default/files/publications/privacy-policy-compliance-directive-047-01_0.pdf [https://perma.cc/WT85-QVMR].

23  [21] *Id.*

24  [22] *See* Privacy Act of 1974, 5 U.S.C. § 552a(e)(3) ("Each agency that maintains a system of records
   shall— . . . (3) inform each individual whom it asks to supply information, on the form which it uses
25  to collect the information or on a separate form that can be retained by the individual—(A) the
   authority (whether granted by statute, or by executive order of the President) which authorizes the
26  solicitation of the information and whether disclosure of such information is mandatory or voluntary;
   (B) the principal purpose or purposes for which the information is intended to be used; (C) the routine
27  uses which may be made of the information, as published pursuant to paragraph (4)(D) of this
   subsection; and (D) the effects on him, if any, of not providing all or any part of the requested
28  information.").

production, storage, and dissemination of the ICE video recordings makes clear that the records requested by Plaintiff are of significant interest to impacted noncitizens and the wider public.

26.     According to the Electronic Privacy Information Center ("EPIC"), ICE's internal investigations reveal "how ICE agents and hired contractors regularly violate the agency's rules on database access, allowing for stalking, wrongful surveillance and the sale of government information."[23]

27.     The Center on Privacy & Technology at Georgetown Law School has likewise underscored how ICE has "without any judicial, legislative or public oversight . . . reached into datasets containing personal information about the vast majority of people living in the U.S."[24] The Center called attention to the "evident civil rights implications of ICE's surveillance practices" that ICE has sustained by "shroud[ing] those practices in near-total secrecy."[25] Among these practices is ICE's use of facial recognition searches on state and local data sets, part of its $2.8 billion spending on "new surveillance, data collection and data-sharing initiatives" between 2008 and 2021.[26]

28.     A major investigative report conducted by WIRED relied on FOIA disclosures to discover that "ICE employees have been investigated for misusing agency data or computers at least 414 times since 2016."[27] The report notes that the breadth and depth of ICE's "access to data sets" has led "experts [to be] particularly concerned about how an agency with a prolific history of misconduct could abuse these tools."[28]

29.     Plaintiff's FOIA requests seek to uncover the extent to which widespread violations by ICE officers might extend into DHS and ICE's secretive management of its recordings of noncitizens. Upon information and belief, a DHS or ICE officer could access an extensive archive of unedited and uncensored footage and use compromising footage of noncitizens with the intent to stalk, harass, or

---

[23] Wiener, *supra* note 1.

[24] Center on Privacy & Technology, *American Dragnet: Data-driven Deportation in the 21st Century*, Georgetown Law (May 10, 2022), https://americandragnet.org/.

[25] *Id.*

[26] *Id.*

[27] Mehrotra, *supra* note 1.

[28] *Id.*

Case No.
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

otherwise harm. Until the public receives basic insight into how DHS and ICE manage and safeguard their extensive video archive, there is no compelling reason to believe that this archive is any less vulnerable to the kinds of misconduct that have already come to light.

**IV.     PLAINTIFF SUBMITTED TWO FOIA REQUESTS TO DHS AND ICE FOR RECORDS AND RECORDINGS SEVEN MONTHS AGO.**

30.     Plaintiff submitted two FOIA requests on May 2, 2023. The two requests were sent to both DHS and ICE. This complaint addresses DHS and ICE's violation of FOIA with respect to these two interrelated requests.

31.     FOIA Request (1) sought records related to ICE's recording practices. Plaintiff sought "[a]ll documents, preserved in physical or electronic form" that contained a combination of select terms – e.g. "film(ing)" or "videographer" – that were in the possession of named officers and holders of specific titles (e.g. "Chief of Visual Communications"), dating back to March 1, 2018. For the specified officers and individuals, the request also sought "any written communication preserved in electronic form, including e-mail correspondence and attached documents" that contained a combination of select terms—e.g. "video" *and* "raid." Plaintiff also requested any complete or signed "DHS Multimedia Agreement" as defined in DHS Instructions 109-01-001, dating back to March 1, 2018. ICE's records are likely to exist given that the specified search terms, documents titles, and office titles were selected because they have appeared in publicly available sources like DHS webpages or LinkedIn.[29]

32.     FOIA Request (2) sought video and audio recordings of ICE enforcement actions in California between September 28, 2020 and October 2, 2020. Plaintiff narrowed this FOIA request to this specific week in order to obtain the recordings from a particularly large-scale operation conducted by ICE in California that lasted five days. There is a strong likelihood that a sizable number of videos were recorded in this operation, given that ICE has published one video depicting

---

[29] *See, e.g.*, *DHS Multimedia Agreement Documentary Format 2020*, U.S. Dep't Homeland Sec., *supra* note 9; Chuck Reed, LINKEDIN, https://www.linkedin.com/in/chuck-reed-7026192/ (last visited Nov. 14, 2023) ("Chief of Visual Communications at U.S. Immigration and Customs Enforcement").

the arrest and detention of three individuals during that week.[30] ICE's longstanding and widespread practice of recording its operations suggests that additional unedited recordings of ICE operations likely exist but have not been made public.

33.    Both of Plaintiff's FOIA requests included requests for a full fee waiver on the grounds that disclosure of the requested records is in the public interest and is "likely to contribute significantly to public understanding of operations or activities of the government and is not primarily in the commercial interest of the requestor." 5 U.S.C. § 552(a)(4)(A)(iii). Ex. A; Ex. B. Both FOIA requests also included requests for a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 6 C.F.R. § 5.11(d)(1) in the event that Defendants denied the requests for full waivers. Ex. A; Ex. B.

34.    Defendants, DHS and ICE, unlawfully disregarded Plaintiff's requests in spite of Plaintiff's proactive delineation of a clear and limited set of search terms, individuals of interest, and time ranges in the FOIA requests.

**V.    DEFENDANTS VIOLATED FOIA BY FAILING TO MAKE A TIMELY DETERMINATION OF PLAINTIFF'S FOIA REQUESTS AND FAILING TO CONDUCT A REASONABLE SEARCH.**

35.    Defendant ICE acknowledged receipt of Plaintiff's FOIA Request (1) for records sent on May 2, 2023 in two confirmation emails on May 12, 2023. Ex. C. Defendant's second confirmation email included an acknowledgment of Plaintiff's fee waiver request that was missing from the first confirmation email. Defendant ICE also acknowledged receipt of Plaintiff's FOIA Request (2) for recordings sent on May 2, 2023 in one confirmation email on May 16, 2023 that also acknowledged Plaintiff's fee waiver request. Ex. D.

36.    Defendants DHS and ICE, however, have failed to respond to Plaintiff's requests within the twenty days afforded for normal processing. 5 U.S.C. § 552 (a)(6)(A)(i); 6 C.F.R. § 5.6(c), or the ten additional days provided for "unusual circumstances." 5 U.S.C. § 552(a)(6)(B); 6 C.F.R. § 5.5(c).

---

[30] *DHS announces ICE enforcement actions on criminal aliens released due to California sanctuary policies*, DVIDS, *supra* note 13.

37.     Despite receiving the FOIA requests 150 working days ago, Defendants have yet to produce a single document.

38.     Defendants are required to conduct a "search reasonably calculated to uncover all relevant documents." *Zemansky v. EPA*, 767 F.2d 569 (9th Cir. 1985). Upon information and belief, such a search of Defendants' documents should have yielded significant responsive records.

39.     Defendants' failure to provide any substantive responses to Plaintiff's FOIA requests reveals a clear failure to conduct a search for records and to make the records available promptly. *See* 5 U.S.C. §§ 552(a)(3)(C) & (6)(C)(i).


**FIRST CAUSE OF ACTION**
**(Freedom of Information Act—Failure to Comply with Time Limit Provision)**

40.     Plaintiff repeats and re-alleges the factual allegations contained in paragraphs 1 through 39, inclusive.

41.     By letters dated May 2, 2023, Plaintiff submitted two requests to Defendants pursuant to the Freedom of Information Act. Ex. A; Ex. B.

42.     Defendants have a statutory obligation to determine whether they will comply with the FOIA requests and to communicate that determination to Plaintiff. Defendants failed to respond to Plaintiff's requests within the 20 days provided under the FOIA statute, 5 U.S.C. § 552(a)(6)(A)(i); 6 C.F.R. § 5.6(c), or the additional 10 days provided for "unusual circumstances," 5 U.S.C. § 552(a)(6)(B); 6 C.F.R. § 5.5(c).

43.     Defendants' failure to notify Plaintiff of their determination of whether to comply with Plaintiff's requests violates FOIA, 5 U.S.C. §§ 552(a)(6)(A)(i) & (a)(6)(B); 6 C.F.R. § 5.5(c).

44.     Plaintiff has exhausted all applicable administrative remedies with respect to Defendants' failure to determine whether they will comply with Plaintiff's requests. 5 U.S.C. § 552(a)(6)(C)(i); 6 C.F.R. § 5.8(e).

45.     Plaintiff has a legal right under FOIA, 5 U.S.C. § 552(a)(6)(A)(i) & (a)(6)(B); 6 C.F.R. § 5.5(c), to timely notification from Defendants, and there exists no basis for Defendants' denial of this right.

**SECOND CAUSE OF ACTION**
**(Freedom of Information Act—Failure to Conduct a Reasonable Search for Records Responsive to Plaintiff's Request)**

46.     Plaintiff repeats and re-alleges the factual allegations contained in paragraphs 1 through 39, inclusive.

47.     By letters dated May 2, 2023, Plaintiff submitted two requests to Defendants pursuant to the Freedom of Information Act. Ex. A; Ex. B.

48.     In response to a FOIA request, Defendants have a statutory obligation to search for "agency records for the purpose of locating those records which are responsive to a request." FOIA, 5 U.S.C. § 552(a)(3)(D); *see* 6 C.F.R. § 5.4. Defendants are also required to "make reasonable efforts to search for the records in electronic form or format." 5 U.S.C. § 552(a)(3)(C); *see* 6 C.F.R. § 5.4(i)(2). Defendants have not provided Plaintiff with any records.

49.     Defendants' failure to undertake a search reasonably calculated to uncover all relevant records sought by Plaintiff's request violates FOIA, 5 U.S.C. § 552(a)(3), and corresponding agency regulations, *see* 6 C.F.R. § 5.4.

50.     Plaintiff has exhausted all required and available administrative remedies with respect to this claim. 5 U.S.C. § 552(a)(6)(C)(i); 6 C.F.R. § 5.8(e).

51.     Plaintiff has a legal right under FOIA to enforce Defendants' obligation to undertake a search reasonably calculated to uncover all relevant records that are responsive to Plaintiff's FOIA requests, and there exists no basis for Defendants' denial of this right. 5 U.S.C. § 552(a)(4)(B).

**THIRD CAUSE OF ACTION**
**(Freedom of Information Act—Failure to Make Records Promptly Available)**

52.     Plaintiff repeats and re-alleges the factual allegations contained in paragraphs 1 through 39, inclusive.

53.     By letters dated May 2, 2023, Plaintiff submitted two requests to Defendants pursuant to the Freedom of Information Act. Ex. A; Ex B.

54.     Defendants have a statutory obligation to make records sought by Plaintiff's request "promptly available." 5 U.S.C. § 552(a)(3)(A). Defendants have produced no responsive records

Case No.

whatsoever, despite acknowledging receipt of Plaintiff's requests on May 12 and May 16, 2023. Ex. C; Ex. D.

55.     As of December 8, 2023, Defendants have neither responded nor produced any responsive records.

56.     Defendants' failure to make responsive records sought by Plaintiff's requests "promptly available" violates FOIA. *See* 5 U.S.C. § 552(a)(3)(A).

57.     Plaintiff has exhausted all required and available administrative remedies with respect to Defendants' failure to make records sought by Plaintiff's request "promptly available." 5 U.S.C. § 552(a)(6)(C)(i); *see* 6 C.F.R. § 5.8(e).

58.     Plaintiff has a legal right under FOIA to obtain the agency records they seek and there is no legal basis for Defendants' denial of said right.

**FOURTH CAUSE OF ACTION**
**(Freedom of Information Act—Failure to Respond to and Timely Grant Plaintiffs' Requests for a Fee Waiver)**

59.     Plaintiff repeats and re-alleges the factual allegations contained in paragraphs 1 through 39, inclusive.

60.     By letters dated May 2, 2023, Plaintiff submitted two requests to Defendants pursuant to the Freedom of Information Act. Ex. A; Ex B.

61.     Defendants failed to respond to and timely grant Plaintiff's requests for a fee waiver in violation of 5 U.S.C. § 552(a)(4)(A)(iii) and the agencies' corresponding regulations.

**FIFTH CAUSE OF ACTION**
**(Freedom of Information Act—Failure to Respond to and Timely Grant Plaintiffs' Requests for a Limitation of Fees)**

62.     Plaintiff repeats and re-alleges the factual allegations contained in paragraphs 1 through 39, inclusive.

63.     By letters dated May 2, 2023, Plaintiff submitted two requests to Defendants pursuant to the Freedom of Information Act. Ex. A; Ex B.

64.     Defendants failed to respond to and timely grant Plaintiff's requests for a limitation of fees in violation of 5 U.S.C. § 552(a)(4)(A)(ii)(II) and the agencies' corresponding regulations.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court award them the following relief:

      A.      Declare, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Defendants violated the Freedom of Information Act (FOIA), 5 U.S.C. § 552;

      B.      Order all Defendants to determine whether they will comply with Plaintiff's May 2, 2023 FOIA requests and to communicate that determination to Plaintiff;

      C.      Order all Defendants to conduct a reasonable search for all responsive records;

      D.      Order all Defendants to promptly disclose the requested records in their entirety and make copies available to Plaintiff;

      E.      Order Defendants to prepare an index pursuant to *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974), for any documents they seek to withhold under a FOIA exemption;

      F.      Award Plaintiff their reasonable costs and attorneys' fees pursuant to 5 U.S.C.§ 552(a)(4)(E); and

      G.      Order such other relief as the Court deems just and appropriate.

Respectfully submitted,

DATED:  December 8, 2023      IMMIGRANTS' RIGHTS CLINIC
Mills Legal Clinic at Stanford Law School

By:  */s/ Jayashri Srikantiah*
      JAYASHRI SRIKANTIAH
      Director of the Mills Legal Clinic
      Director, Immigrants' Rights Clinic

      */s/ Truman Chen*
      TRUMAN CHEN
      Certified Law Student

      On Behalf of Plaintiff,
      Immigrant Legal Defense

Case No.
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# Exhibit A

Immigrants' Rights Clinic

Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305-8610
Tel  650 724-1900
Fax  650 723-4426

Mills Legal Clinic
Stanford Law School

May 2, 2023

U.S. Department of Homeland Security
Headquarters & Privacy Office
Privacy Office, Mail Stop 0655
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0655

United States Immigration & Customs Enforcement
FOIA Office
500 12th Street, SW, Stop 5009
Washington, DC 20536-5009

Re:   **FOIA Request for Records Related to Immigration and Customs
      Enforcement Recording Practices**

Dear FOIA Officer:

This letter is a request pursuant to the Freedom of Information Act (FOIA), 5. U.S.C. § 552, by
the Stanford Law School Immigrants' Rights Clinic on behalf of Immigrant Legal Defense (ILD)
(the "Requestor").  ILD seeks records about enforcement and removal operations of the U.S.
Immigration and Customs Enforcement (ICE), an agency of the U.S. Department of Homeland
Security (DHS). Specifically, this request seeks records pertaining to the agency's practice of
engaging videographers and camera crews to film arrests, raids, and other enforcement actions.[1]
This request also seeks records regarding ICE's relationships with private filmmakers and
production companies, and the agency's practice of granting private filmmakers access to
observe and film agency operations.

Since at least 2010, ICE has amassed hundreds of videos of various internal agency operations,
including home arrests, work-place raids, and tours of immigration detention facilities.[2]

---

[1] *See e.g.,* U.S. Immigr. and Customs Enf't, *Enforcement and Removal Operations arrests 175 during national
operations targeting noncitizens convicted of DUI and related criminal convictions for serious bodily injury, death, hit and
run or property damage,* FACEBOOK (Oct. 19, 2022),
https://www.facebook.com/watch/?v=626700598937105

[2] *See U.S. Immigration and Customs Enforcement,* https://www.dvidshub.net/unit/ICE (identifying 320
videos and 1,745 ICE images posted to DVIDS dating back as a far as 2010) (hereinafter "ICE DVIDs).

Community Law ❖ Criminal Defense ❖ Environmental Law ❖ Immigrants' Rights
International Human Rights and Conflict Resolution ❖ Juelsgaard Intellectual Property and Innovation
Organizations and Transactions ❖ Religious Liberty ❖ Supreme Court Litigation ❖ Youth and Education Law Project

May 2, 2023
Page 2

According to publically available records, these videos are primarily created by Audiovisual Production Specialists employed by DHS or by freelance videographers hired by ICE and invited to "ride-along" when officers arrest, detain, and remove noncitizens.[3] Further, according to the agency's website, videographers play a critical role in agency operations. During ICE operations, they are not passive observers, they are a "part of the team."[4] The raw footage they capture is edited into short films and promotional materials and uploaded for public consumption.[5] On one publically available website, ICE videographers have uploaded more than 300 videos of agency actions.[6] These videos capture the images of countless noncitizens and members of the general public.[7]

In addition to employing its own videographers and camera crews, ICE regularly contracts with independent filmmakers, documentarians, and multimedia production companies, granting them access to observe and record internal agency operations.[8] Under ICE's standard contract agreement, these independent filmmakers and multimedia production companies must provide DHS with a copy of the final, fully edited footage.[9] Access to the footage created by these independent filmmakers only expands ICE's film catalog of agency operations.

There is a compelling and urgent need to obtain records and inform the public about ICE's video recording practices, particularly, ICE's practice of recording its operations in vulnerable communities. The practice of engaging videographers or granting access to independent camera crews to document ICE arrests and removal operations implicates the fundamental due process and privacy rights of the subjects of these operations and of countless bystanders captured in the background. These operations also foster a climate of fear and anguish in the communities where these government activities take place. Despite the size and scale of ICE's video recording operation and the sensitive subject matter involved, little is known about the policies governing

---

*See also* , U.S. Immigr. and Customs Enf't, *Worksite Enforcement Operation – Mississippi*, DVIDS (Aug. 7, 2019), https://www.dvidshub.net/video/701631/worksite-enforcement-operation-mississippi.

[3] *ICE, CAMERA, ACTION*, U.S. Immigr. and Customs Enf't, https://www.ice.gov/topics/ice-camera-action#content1 (hereinafter "ICE, Camera, Action").

[4] *Id.*

[5] *News Releases*, U.S. Immigr. and Customs Enf't, https://www.ice.gov/newsroom.

[6] ICE DVIDs *supra*, note 2.

[7] *See id. See also* U.S. Immigr. and Customs Enf't, *Enforcement and Removal Operations - An Introduction*, YouTube (Mar. 3, 2014), https://www.youtube.com/watch?v=vcyGHbW27nw&list=PL35263343B6FE4A96&index=3

[8] *See DHS Multimedia Agreement for Documentary Productions*, U.S. Dep't of Homeland Sec., https://www.dhs.gov/sites/default/files/publications/20_0819_opa_dhs-multimedia-agreement-documentary-productions.pdf (hereinafter " DHS Multimedia Agreement). *See also* Caitlin Dickerson, *A Rare Look Inside Trump's Immigration Crackdown Draws Legal Threats*, The New York Times (updated Feb. 1, 2021), https://www.nytimes.com/2020/07/23/us/trump-immigration-nation-netflix.html.

[9] *See* DHS Multimedia Agreement *supra*, note 8.

May 2, 2023
Page 3

ICE's recording practices. The public should have access to information about the circumstances in which ICE permits videographers—those employed by the government and those who contract with ICE—to record arrests, detentions, and removals.  The public should also have access to information about how ICE uses, retains, and shares the video footage it has. Because ICE's video recording practices concern a critical government function on a matter of significant public interest and concern, FOIA mandates its disclosure.

<div align="center">

**Records Requested**

</div>

ILD requests the following records:

1. All documents, preserved in physical or electronic form, containing a combination of the following terms:
   a. "film(ing)" or "video record(ing)" or "videographer," or "camera crew"; **and**
   b. "field operation(s)" or "fugitive operation(s)" or "arrest" or "raid," or "enforcement action";

   From March 1, 2018 to the present, in the possession of the following custodians:
   c. Michael Johnson, *Division Chief, Digital Engagement, Immigration and Customs Enforcement Office of Public Affairs,*
   d. Any individual who held the title *Division Chief, Digital Engagement, Immigration and Customs Enforcement* during the aforementioned time period;
   e. Charles Reed*, Chief of Visual Communications, Immigration and Customs Enforcement;*
   f. Any individual who held the title *Chief of Visual Communications, Immigrations and Customs Enforcement* during the aforementioned time period;
   g. Any individual who has held the title of *Deputy Field Office Director* of the Dallas, El Paso,  Los Angeles, or Miami ICE Field Office during the aforementioned time period;
   h. Any individual who has held the title of *Assistant Field Office Director* of the Dallas, El Paso, Los Angeles, or Miami ICE Field Office during the aforementioned time period; **or**
   i. Any *Audio and Visual Production Specialist* employed by the Department Homeland Security (DHS) during the aforementioned time period, including without limitation Todd Packard, Marshall Amey, James Truitt, Corey Bullard, Blackburn, or Ron Rogers.

2. Any written communication preserved in electronic form, including e-mail correspondence and attached documents, containing a combination of the following terms:
   a. "video" or "footage" or "B-roll"; **and**
   b. "ride-along" or "field operation(s)" or "fugitive operation(s)" or  "arrest" or "raid";

   from March 1, 2018 to the present, in the possession of the following custodians:
   c. Michael Johnson, *Division Chief, Digital Engagement, Immigration and Customs Enforcement Office of Public Affairs;*

May 2, 2023
Page 4

    d.   Any individual who held the title *Division Chief, Digital Engagement, Immigrations and Customs Enforcement* during the aforementioned time period;

    e.   Charles Reed, *Chief of Visual Communications, Immigration and Customs Enforcement*;

    f.   Any individual who held the title *Chief of Visual Communications, Immigrations and Customs Enforcement* during the aforementioned time period;

    g.   Any individual who has held the title of *Deputy Field Office Director* of the Dallas, El Paso, Los Angeles, or Miami ICE Field Office during the aforementioned time period;

    h.   Any individual who has held the title of *Assistant Field Office Director* of the Dallas, El Paso, Los Angeles, or Miami ICE Field Office during the aforementioned time period; **or**

    i.   Any *Audio and Visual Production Specialist* employed by the Department Homeland Security (DHS), including without limitation Todd Packard, Marshall Amey, James Truitt, Corey Bullard, Blackburn, or Ron Rogers.

3.   Any complete or signed "DHS Multimedia Agreement," as defined in DHS Instructions 109-01-001, from March 1, 2018 to the present.

4.   Written communications preserved in electronic form, including e-mail correspondence and attached documents, containing the following phrases:

    a.   "proposed pilot"; "shooting schedule"; "outline of the production"; **or** "approved production";

from March 1, 2018 to the present, in the possession of the following custodians:

    b.   Brandon A. Montgomery, *Director, DHS, Office of Multimedia Liaison*;

    c.   The current *Director of DHS' Office of Multimedia Liaison*; **or**

    d.   Any individual who has held the title of *Director of DHS' Office of Multimedia Liaison* during the aforementioned time period.

The requestor does *not* request video footage of enforcement actions.

## The Requestor

**Immigrant Legal Defense (ILD)** is a nonprofit agency dedicated to promoting justice and fostering systemic change through the provision of free legal services to underserved immigrant communities across California. Together, ILD's attorneys, legal assistants, and staff have represented thousands of unaccompanied minors, families seeking asylum, and detained and non-detained individuals facing removal from the United States. They have also provided individual and class-wide representation to noncitizens demanding increased rights and protections for immigrants. In addition to representing noncitizens in individual and class-wide cases, ILD also collaborates with other legal service providers and community organizers on advocacy relating to local, regional, statewide, and national immigration law and policy. ILD also regularly offers technical assistance, legal training, and public education on immigration-related topics to other immigration advocates as well as members of the public. Because of its innovative programs and partnerships, ILD is recognized as a national model for both the

May 2, 2023
Page 5

delivery of critical legal services and advocacy.  As part of its mission to serve vulnerable communities in California, ILD engages in efforts to ensure transparency by immigration agencies. ILD intends to share records obtained through this FOIA request with the public at no cost.

### Fee Waiver

The Requestor seeks a full fee waiver on the grounds that disclosure of the requested records is in the public interest and is "likely to contribute significantly to public understanding of operations or activities of the government and is not primarily in the commercial interest of the requestor." 5 U.S.C. § 552(a)(4)(A)(iii). As set forth above, this request aims to further public understanding of ICE programs and practices that directly affect untold numbers of noncitizens as well as members of the public captured in video recordings of ICE enforcement actions. These policies and practices are of interest to the general public.

The public interest fee waiver provision "is to be liberally construed in favor of waivers for noncommercial requesters." *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1284 (9th Cir. 1987). The relevant question is whether the requested information is likely to contribute significantly to public understanding of the operations or activities of the government, good or bad. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1314 (D.C. Cir. 2003). Disclosure of the information and report sought is in the public interest and will contribute significantly to the public's understanding of the treatment of immigrants during enforcement actions. The requested records also relate directly to government operations, including the use and storage of video files that potentially implicate fundamental rights and freedoms, including the right to privacy. The requested records also relate to the relationship between the federal government and private, for-profit contracted entities. The records are not sought for commercial use, and the Requestor plans to disseminate the information disclosed through print and other media to the public at no cost. As demonstrated above, the Requestor has both the intent and ability to convey any information obtained through this request to the public and is therefore entitled to a full fee waiver under 5 U.S.C. § 552(a)(4)(A)(iii).

Should the request for a full fee waiver be denied, Requestor also seeks a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by…educational or noncommercial scientific institution…or a representative of the news media") and 6 C.F.R. § 5.11(d)(1) (search fees shall not be charged to "representatives of the news media"). Requestor is a non-profit organization that intends to disseminate the information gathered by this request to the public at no cost, including through the Requestor's website and social media. The organization regularly disseminates information to private, government, and nonprofit legal practitioners and members of the public and media through trainings, written advisories, reports, newsletters, blogs, resource libraries, and action alerts. *See* https://www.ild.org/. The Requestor may also compile a report or other publication on the government's treatment of immigrants based on information gathered through this FOIA.

May 2, 2023
Page 6

The "term 'a representative of the news media' means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii). The statutory definition does not require that the requestor be a member of the traditional media. As long as a requestor meets the definition in any aspect of its work, it qualifies of limitation of fees under this section of the statute. The Requestor qualifies as a "representative of the news media" under the statutory definition because they routinely gather information of interest to the public and use editorial skills to turn it into distinct work that is distributed to the public. See *Electronic Privacy Information Center v. Department of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003) (non-profit organization that gathered information and published it in newsletters and otherwise for general distribution qualified as representative of news media for purpose of limiting fees). Courts have reaffirmed that non-profit requestors who are not traditional news media outlets can qualify as representatives of the new media for the purposes of the FOIA, including after the 2007 amendments to the FOIA. *See, e.g., ACLU of Washington v. U.S. Dep't of Justice*, No. C09-0642RSL, 2011 WL 887731, at *18 (D. Wash. Mar. 10, 2011) (finding that the ACLU qualifies as a "representative of the news media"). Accordingly, any fees charged must be limited to duplication costs.

Please send responsive records to:

> Shanti Tharayil
> Jayashri Srikantiah
> Stanford Law School Immigrants' Rights Clinic
> 559 Nathan Abbott Way
> Stanford, CA 94305
> e: tharayil@law.stanford.edu
> e: jsrikantiah@law.stanford.edu

Thank you for your attention. Please contact us at the email addresses listed above with any questions or concerns or by phone at 650.725.7958.

Sincerely,

Shanti Tharayil
Immigrants' Rights Clinic, Attorney

On Behalf of Immigrant Legal Defense

# Exhibit B

Immigrants' Rights Clinic

Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305-8610
Tel  650 724-1900
Fax 650 723-4426

May 2, 2023


U.S. Department of Homeland Security
Headquarters & Privacy Office
Privacy Office, Mail Stop 0655
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0655

United States Immigration & Customs Enforcement
FOIA Office
500 12th Street, SW, Stop 5009
Washington, DC 20536-5009


**Re:    FOIA Request for Video and Audio Recordings of ICE Enforcement Actions**

Dear FOIA Officer:

This letter is a request pursuant to the Freedom of Information Act (FOIA), 5. U.S.C. § 552, by the Stanford Law School Immigrants' Rights Clinic on behalf of Immigrant Legal Defense (ILD) (the "Requestor").  ILD seeks video and audio recordings in the possession of U.S. Immigration and Customs Enforcement (ICE), an agency of the Department of Homeland Security (DHS). Specifically, ILD requests video and audio recordings of immigration enforcement actions in California during the week of September 28, 2020.

There is a compelling and urgent need to obtain ICE's video and audio footage from September 28 2020 to October 2, 2020 and to inform the public, particularly impacted communities, about the contents of these recordings. On September 28, 2020, ICE launched a sweeping governmental operation in California that lasted five days and resulted in the arrest and removal of hundreds of individuals from many local communities throughout the state.[1]  The tactics and practices employed by ICE officers during this multi-day, statewide operation implicated the fundamental due process rights of hundreds of targeted individuals and negatively impacted countless others who witnessed the arrest and removal of their fellow community members.[2]

---

[1] *See* U.S. Immigr. and Customs Enf't, *DHS Announces ICE Enforcement Actions on Criminal Aliens Released Due to California Sanctuary Policy,* (Oct. 7, 2020) https://www.ice.gov/news/releases/dhs-announces-ice-enforcement-actions-criminal-aliens-released-due-california

[2] *See* Am. Immigr. Council, *U.S. Citizen Children Impacted by Immigration Enforcement,* (June 24, 2021), https://www.americanimmigrationcouncil.org/sites/default/files/research/us_citizen_children_impacted_by_immigration_enforcement_0.pdf

Community Law  ❖  Criminal Defense  ❖  Environmental Law  ❖  Immigrants' Rights
International Human Rights and Conflict Resolution  ❖  Juelsgaard Intellectual Property and Innovation
Organizations and Transactions  ❖  Religious Liberty  ❖  Supreme Court Litigation  ❖  Youth and Education Law Project

May 2, 2023
Page 2

Despite the scale of the operation, little is known about it. Whether ICE officers acted in a manner consistent with agency guidance and state and federal law governing the arrest, detention, and removal of noncitizens is an unanswered question. This question is of significant importance to the general public and to the individuals and local communities targeted during the operation. Unedited audio and visual recordings from this period will help answer these open questions.

The public should have access to any unedited audio or visual recordings of ICE's enforcement operations in California between September 28 and October 2, 2020. Since at least 2010, ICE has created and made public hundreds of videos of various internal agency operations, including arrests, detention, and removals.[3] On one publically available website, ICE videographers have uploaded more than 300 videos of agency actions.[4] Among these is a five-minute video depicting the arrest and detention of three different individuals in California during the week of September 28, 2020.[5] Given ICE's widespread practice of recording its operations, additional and unedited recordings of ICE operations in California likely exist but have not been made public. These videos contain important information about the tactics used when arresting noncitizens and whether ICE officers are acting in a manner consistent with ICE's own protocols and state and federal due process laws. Because these video and audio records contain information about a critical government function on a matter of significant public interest and concern, FOIA mandates their disclosure.

### Records Requested

ILD requests the following records:

1. Any audio or visual recordings of ICE operations, including arrests, detention, and removals, in California between September 28, 2020 and October 2, 2020.

### The Requestor

**Immigrant Legal Defense (ILD)** is a nonprofit agency dedicated to promoting justice and fostering systemic change through the provision of free legal services to underserved immigrant communities across California. Together, ILD's attorneys, legal assistants, and staff have represented thousands of unaccompanied minors, families seeking asylum, and detained and non-detained individuals facing removal from the United States. They have also provided individual and class-wide representation to noncitizens demanding increased rights and

---

[3] *See* U.S. Immigr. and Customs Enforcement, https://www.dvidshub.net/unit/ICE (identifying 320 videos and 1,745 ICE images posted to DVIDs) (hereinafter "ICE DVIDs").

[4] *Id.*

[5] U.S. Immigr. and Customs Enf't, *DHS Announces ICE Enforcement Action on Criminal Aliens Released Due to California Sanctuary Policies*, https://www.dvidshub.net/video/768708/dhs-announces-ice-enforcement-actions-criminal-aliens-released-due-california-sanctuary-policies

May 2, 2023
Page 3

protections for immigrants. In addition to representing noncitizens in individual and class-wide cases, ILD also collaborates with other legal service providers and community organizers on advocacy relating to local, regional, statewide, and national immigration law and policy. ILD also regularly offers technical assistance, legal training, and public education on immigration-related topics to other immigration advocates as well as members of the public. Because of its innovative programs and partnerships, ILD is recognized as a national model for both the delivery of critical legal services and advocacy. As part of its mission to serve vulnerable communities in California, ILD engages in efforts to ensure transparency by immigration agencies. ILD intends to share records obtained through this FOIA request with the public at no cost.

## Fee Waiver

The Requestor seeks a full fee waiver on the grounds that disclosure of the requested records is in the public interest and is "likely to contribute significantly to public understanding of operations or activities of the government and is not primarily in the commercial interest of the requestor." 5 U.S.C. § 552(a)(4)(A)(iii). As set forth above, this request aims at furthering public understanding of the practices ICE officers used when arresting and detaining hundreds of noncitizens in the fall of 2020. The tactics employed directly affect the rights of individuals arrested during that time period and countless others who are subjected to similar treatment. These operations also have a lasting impact on the communities that witness them. Consequently, records documenting ICE's practices and tactics are of considerable interest to the general public.

The public interest fee waiver provision "is to be liberally construed in favor of waivers for noncommercial requesters." *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1284 (9th Cir. 1987). The relevant question is whether the requested information is likely to contribute significantly to public understanding of the operations or activities of the government. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1314 (D.C. Cir. 2003). Disclosure of the information sought is in the public interest and will contribute significantly to the public's understanding of the treatment of immigrants during ICE arrests, detention, and removals. The requested records also relate directly to government operations that potentially impact fundamental due process rights afforded to immigrants in the United States. These government operations also impact the fabric of society—the communities that witness these operations and cope with the aftermath. The records are not sought for commercial use, and the Requestor plans to disseminate the information to the public at no cost. As demonstrated above, the Requestor has both the intent and ability to convey any information obtained through this request to the public and is therefore entitled to a full fee waiver under 5 U.S.C. § 522(a)(4)(A)(iii).

Should the request for a full fee waiver be denied, Requestor also seeks a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by...educational or noncommercial scientific institution...or a representative of the news media") and 6 C.F.R. § 5.11(d)(1) (search fees shall not be charged to "representatives

May 2, 2023
Page 4

of the news media"). Requestor is a non-profit organization that intends to disseminate the information gathered by this request to the public at no cost, including through the Requestor's website and social media. The organization regularly disseminates information to private, government, and nonprofit legal practitioners and members of the public and media through legal training, public education, written advisories, reports, newsletters, blogs, resource libraries, and action alerts. *See* https://www.ild.org/. The Requestor may also compile a report or other publication on the government's treatment of immigrants based on information gathered through this FOIA.

The "term 'a representative of the news media' means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii). The statutory definition does not require that the requestor be a member of the traditional media. As long as a requestor meets the definition in any aspect of its work, it qualifies of limitation of fees under this section of the statute. The requestor qualifies as a "representative of the news media" under the statutory definition because they routinely gather information of interest to the public and use editorial skills to turn it into distinct work that is distributed to the public. See *Electronic Privacy Information Center v. Department of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003) (non-profit organization that gathered information and published it in newsletters and otherwise for general distribution qualified as representative of news media for purpose of limiting fees). Courts have reaffirmed that non-profit requestors who are not traditional news media outlets can qualify as representatives of the new media for the purposes of the FOIA, including after the 2007 amendments to the FOIA. *See, e.g., ACLU of Washington v. U.S. Dep't of Justice*, No. C09-0642RSL, 2011 WL 887731, at \*18 (D. Wash. Mar. 10, 2011) (finding that the ACLU qualifies as a "representative of the news media"). Accordingly, any fees charged must be limited to duplication costs.

Please send responsive records to:

> Shanti Tharayil
> Jayashri Srikantiah
> Stanford Law School Immigrants' Rights Clinic
> 559 Nathan Abbott Way
> Stanford, CA 94305
> (e) tharayil@law.stanford.edu
> (e) jsrikanthiah@law.stanford.edu

Thank you for your attention. Please contact us with any questions or concerns at the above listed email addresses or by phone at 650.725.7958.

May 2, 2023
Page 5

Sincerely,

Shanti Tharayil
Immigrants' Rights Clinic, Attorney

On Behalf of Immigrant Legal Defense

# Exhibit C



**Shanti Suzanne Tharayil <tharayil@law.stanford.edu>**

## ICE FOIA 2023-ICFO-25931
2 messages

**ICE-FOIA@ICE.DHS.GOV** <noreply@securerelease.us>           Fri, May 12, 2023 at 12:54 PM
Reply-To: ICE-FOIA@ice.dhs.gov
To: tharayil@law.stanford.edu, jsrikantiah@law.stanford.edu

05/12/2023

Shanti Tharayil
559 Nathan Abbott Way
Stanford, California 94305

RE: ICE FOIA Case Number 2023-ICFO-25931

Dear Requester:

This acknowledges receipt of your 5/2/2023, Freedom of Information Act (FOIA) request to U.S. Immigration and Customs Enforcement (ICE), for records pertaining to the agency's practice of engaging videographers and camera crews to film arrests, raids, and other enforcement actions.. Your request was received in this office on 5/12/2023.

Due to the increasing number of FOIA requests received by this office, we may encounter some delay in processing your request. Per Section 5.5(a) of the DHS FOIA regulations, 6 C.F.R. Part 5, ICE processes FOIA requests according to their order of receipt. Although ICE's goal is to respond within 20 business days of receipt of your request, the FOIA does permit a 10-day extension of this time period. As your request seeks numerous documents that will necessitate a thorough and wide-ranging search, ICE will invoke a 10-day extension for your request, as allowed by Title 5 U.S.C. § 552(a)(6)(B). If you're able to narrow the scope of your request please contact our office. Narrowing the scope may speed up the search process. We will make every effort to comply with your request in a timely manner.

Provisions of the FOIA allow us to recover part of the cost of complying with your request. We shall charge you for records in accordance with the DHS Interim FOIA regulations as they apply to educational requesters. As an educational requester, you will be charged 10 cents per page for duplication; the first 100 pages are free. We will construe the submission of your request as an agreement to pay up to $25.00. You will be contacted before any further fees are accrued.

We have queried the appropriate program offices within ICE for responsive records. If any responsive records are located, they will be reviewed for determination of releasability. Please be assured that one of the processors in our office will respond to your request as expeditiously as possible. We appreciate your patience as we proceed with your request.

If you have any questions, please contact FOIA Public Liaison, Fernando Pineiro Jr. at the address above or (866) 633-1182. Additionally, you have a right to seek dispute resolution services from the Office of Government Information Services (OGIS) which mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974. You may contact OGIS as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Your request has been assigned reference number 2023-ICFO-25931. Please use this number in future correspondence.

Sincerely,

ICE FOIA Office
Immigration and Customs Enforcement

Freedom of Information Act Office
500 12th Street, S.W., Stop 5009
Washington, D.C. 20536-5009

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message and any disclosure, copying, or distribution of this message, or the taking of any action based on it, by you is strictly prohibited.

Deloitte refers to a Deloitte member firm, one of its related entities, or Deloitte Touche Tohmatsu Limited ("DTTL"). Each Deloitte member firm is a separate legal entity and a member of DTTL. DTTL does not provide services to clients. Please see www.deloitte.com/about to learn more.

v.E.1

---

**ICE-FOIA@ICE.DHS.GOV** <noreply@securerelease.us>        Fri, May 12, 2023 at 1:11 PM
Reply-To: ICE-FOIA@ice.dhs.gov
To: tharayil@law.stanford.edu, jsrikantiah@law.stanford.edu

05/12/2023

Shanti Tharayil
559 Nathan Abbott Way
Stanford, California 94305

**RE:  ICE FOIA Case Number 2023-ICFO-25931**

Dear Requester:

This acknowledges receipt of your Freedom of Information Act (FOIA) request to U.S. Immigration and Customs Enforcement (ICE), dated 5/2/2023, and to your request for a waiver of all assessable FOIA fees. Your request was received in this office on 5/12/2023. Specifically, you requested records pertaining to the agency's practice of engaging videographers and camera crews to film arrests, raids, and other enforcement actions..

Due to the increasing number of FOIA requests received by this office, we may encounter some delay in processing your request. Per Section 5.5(a) of the DHS FOIA regulations, 6 C.F.R. Part 5, ICE processes FOIA requests according to their order of receipt. Although ICE's goal is to respond within 20 business days of receipt of your request, the FOIA does permit a 10- day extension of this time period. As your request seeks numerous documents that will necessitate a thorough and wide-ranging search, ICE will invoke a 10-day extension for your request, as allowed by Title 5 U.S.C. § 552(a)(6)(B). If you're able to narrow the scope of your request please contact our office. Narrowing the scope may speed up the search process. We will make every effort to comply with your request in a timely manner.

ICE evaluates fee waiver requests under the legal standard set forth above and the fee waiver policy guidance issued by the Department of Justice on April 2, 1987, as incorporated into the Department of Homeland Security's Freedom of Information Act regulations.  These regulations set forth six factors to examine in determining whether the applicable legal standard for fee waiver has been met.  I have considered the following factors in my evaluation of your request for a fee waiver:

          (1) Whether the subject of the requested records concerns "the operations or activities of the government";
          (2) Whether the disclosure is "likely to contribute" to an understanding of government operations or activities;
          (3) Whether disclosure of the requested information will contribute to the understanding of the public at large, as opposed to the individual understanding of the requestor or a narrow segment of interested persons;
          (4) Whether the contribution to public understanding of government operations or activities will be "significant";
          (5) Whether the requester has a commercial interest that would be furthered by the requested disclosure; and
          (6) Whether the magnitude of any identified commercial interest to the requestor is sufficiently large in comparison with the public interest in disclosure, that disclosure is primarily in the commercial interest of the requestor.

Upon review of your request and a careful consideration of the factors listed above, I have determined to grant your request for a fee waiver.

ICE has queried the appropriate program offices within ICE for responsive records. If any responsive records are located,

they will be reviewed for determination of releasability. Please be assured that one of the processors in our office will respond to your request as expeditiously as possible. We appreciate your patience as we proceed with your request.

If you have any questions please contact FOIA Public Liaison, Fernando Pineiro Jr. at the address above or (866) 633-1182.  Additionally, you have a right to seek dispute resolution services from the Office of Government Information Services (OGIS) which mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation.  If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974.  You may contact OGIS as follows:  Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Your request has been assigned reference number **2023-ICFO-25931**. Please use this number in future correspondence.


Sincerely,

ICE FOIA Office
Immigration and Customs Enforcement
Freedom of Information Act Office
500 12th Street, S.W., Stop 5009
Washington, D.C. 20536-5009



[Quoted text hidden]

# Exhibit D



Shanti Suzanne Tharayil <tharayil@law.stanford.edu>

---

## ICE FOIA 2023-ICFO-26233

**ice-foia@ice.dhs.gov** <noreply@securerelease.us>
Reply-To: ice-foia@ice.dhs.gov
To: tharayil@law.stanford.edu

Tue, May 16, 2023 at 7:08 AM

05/16/2023

Shanti Tharayil
559 Nathan Abbott Way
Stanford, California 94305

**RE: ICE FOIA Case Number 2023-ICFO-26233**

Dear Requester:

This acknowledges receipt of your Freedom of Information Act (FOIA) request to U.S. Immigration and Customs Enforcement (ICE), dated 5/15/2023, and to your request for a waiver of all assessable FOIA fees. Your request was received in this office on 5/15/2023. Specifically, you requested any audio and/or visual recordings of ICE operations, including arrests, detention, and removals, in California between September 28, 2020 and October 2, 2020.

Due to the increasing number of FOIA requests received by this office, we may encounter some delay in processing your request. Per Section 5.5(a) of the DHS FOIA regulations, 6 C.F.R. Part 5, ICE processes FOIA requests according to their order of receipt. Although ICE's goal is to respond within 20 business days of receipt of your request, the FOIA does permit a 10- day extension of this time period. As your request seeks numerous documents that will necessitate a thorough and wide-ranging search, ICE will invoke a 10-day extension for your request, as allowed by Title 5 U.S.C. § 552(a)(6)(B). If you're able to narrow the scope of your request please contact our office. Narrowing the scope may speed up the search process. We will make every effort to comply with your request in a timely manner.

ICE evaluates fee waiver requests under the legal standard set forth above and the fee waiver policy guidance issued by the Department of Justice on April 2, 1987, as incorporated into the Department of Homeland Security's Freedom of Information Act regulations. These regulations set forth six factors to examine in determining whether the applicable legal standard for fee waiver has been met. I have considered the following factors in my evaluation of your request for a fee waiver:

> (1) Whether the subject of the requested records concerns "the operations or activities of the government";
> (2) Whether the disclosure is "likely to contribute" to an understanding of government operations or activities;
> (3) Whether disclosure of the requested information will contribute to the understanding of the public at large, as opposed to the individual understanding of the requestor or a narrow segment of interested persons;
> (4) Whether the contribution to public understanding of government operations or activities will be "significant";
> (5) Whether the requester has a commercial interest that would be furthered by the requested disclosure; and
> (6) Whether the magnitude of any identified commercial interest to the requestor is sufficiently large in comparison with the public interest in disclosure, that disclosure is primarily in the commercial interest of the requestor.

Upon review of your request and a careful consideration of the factors listed above, I have determined to grant your request for a fee waiver.

ICE has queried the appropriate program offices within ICE for responsive records. If any responsive records are located, they will be reviewed for determination of releasability. Please be assured that one of the processors in our office will respond to your request as expeditiously as possible. We appreciate your patience as we proceed with your request.

If you have any questions please contact FOIA Public Liaison, Fernando Pineiro Jr. at the address above or (866) 633-1182. Additionally, you have a right to seek dispute resolution services from the Office of Government Information Services (OGIS) which mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. If you are requesting access to your own records (which is considered a Privacy Act request) you should

know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974.  You may contact OGIS as follows:  Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Your request has been assigned reference number **2023-ICFO-26233**. Please use this number in future correspondence.


Sincerely,

ICE FOIA Office
Immigration and Customs Enforcement
Freedom of Information Act Office
500 12th Street, S.W., Stop 5009
Washington, D.C. 20536-5009



This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message and any disclosure, copying, or distribution of this message, or the taking of any action based on it, by you is strictly prohibited.

Deloitte refers to a Deloitte member firm, one of its related entities, or Deloitte Touche Tohmatsu Limited ("DTTL"). Each Deloitte member firm is a separate legal entity and a member of DTTL. DTTL does not provide services to clients. Please see www.deloitte.com/about to learn more.

v.E.1

# Exhibit E



# Operation Cross Check San Jose

CA, UNITED STATES
12.13.2011
Video by Ron Rogers
U.S. Immigration and Customs Enforcement

Subscribe 68

As part of the Obama administration's ongoing commitment to prioritizing the removal of criminal aliens and egregious immigration law violators, U.S. Immigration and Customs Enforcement (ICE) today announced the results of a seven-day national "Cross Check" enforcement operation-which led to the arrest of more than 2,900 convicted criminal aliens. "The results of this targeted enforcement operation underscore ICE's ongoing commitment and focus on the arrest and removal of convicted criminal aliens and those that game our nation's immigration system," said ICE Director John Morton. "Because of the tireless efforts and teamwork of ICE officers and agents in tracking down at large criminal aliens and fugitives, there are 2,901 fewer criminal aliens in our neighborhoods across the country." This seven-day operation, the largest of its kind, involved the collaboration of more than 1,900 ICE officers and agents from all of ICE's Enforcement and Removal Operations' (ERO) 24 field offices, as well as coordination with our federal, state and local law enforcement partners throughout the United States. Arrests occurred in all 50 states and four U.S. territories. All of the 2,901 individuals taken into custody had prior criminal convictions including at least 1,282 aliens who had multiple criminal convictions. More than 1,600 of those arrested had felony convictions including manslaughter, attempted murder, kidnapping, armed robbery, drug trafficking, child abuse, sexual crimes against minors, and aggravated assault. Of the total 2,901 criminal aliens arrested, 42 were gang members and 151 were convicted sex offenders. In addition to being convicted criminals, 681 of those arrested were also immigration fugitives who had previously been ordered to leave the country but failed to depart. Additionally, 386 were illegal re-entrants who had been previously removed from the country multiple times. Because of their serious criminal histories and prior immigration arrest records, at least 146 of those arrested during the enforcement action were presented to U.S attorneys for prosecution on a variety of charges including illegal re-entry after deportation, a felony which carries a penalty of up to 20 years in prison. The arrestees include: • Virgilio Lopez-Ruiz, 54, a national of the Dominican Republic, who was residing in the Bronx, N.Y., convicted on Nov. 16, 1988, of second degree attempted murder. • Ike Romanus Bright, 51, a national of Nigeria, who was residing in Kyle, Texas, was an ICE fugitive alien convicted on Nov. 5, 1986, of second degree attempted murder. • Jose Gallardo, 51, a national of Mexico, who was residing in North Hollywood, Calif., convicted on March 21, 1996, of kidnapping a child under 14 years of age and shooting at an occupied dwelling. The Department of Justice is filing criminal charges for illegally re-entering the United States after having been removed. • Ian Kirt Kuar, 52, a national of Trinidad and Tobago, who was residing in Hauppauge, N.Y., convicted on Nov. 14, 1975, of second degree manslaughter and convicted on May 12, 1995, of fifth degree criminal sale of a controlled substance. • Roberto Hackett-Baquie, 54, a national of Panama, who was residing in Mountain, Ga., convicted on March 26, 2008, of child molestation. • Euford Brown, 60, a national of Jamaica, who was residing in Mattapan, Mass., was an ICE fugitive alien and a registered sex offender convicted on April 2, 1986, of rape. • Austin Alfredo Alonzo-Fiallos, 36, a national of Honduras, who was residing in West Columbia, S.C., was an ICE fugitive alien convicted on March 2, 1998, of felony burglary-armed assault and felony assault and battery on official employee. He is also wanted in Miami on charges of attempted first degree murder and charges of kidnapping, burglary and armed assault. He is pending extradition to Miami on the criminal charges. ICE conducted the first successful Cross Check operation in December 2009, and has since conducted Cross Check operations in 37 states, including regional operations in the Southeast, Northeast and Midwest regions. In May, ICE conducted the first nationwide Cross Check operation. These previous Cross Check operations resulted in ICE arresting 4,506 convicted criminals, fugitives and aliens nationwide who have illegally re-entered the United States after removal. Last week's enforcement action was spearheaded by ICE's National Fugitive Operations Program (NFOP), which is responsible for locating, arresting and removing at-large criminal aliens and immigration fugitives. The officers who conducted last week's operation received substantial assistance from ICE's Fugitive Operations Support Center (FOSC) and ICE's Law Enforcement Support Center (LESC) both located in Williston, Vt. ICE is focused on smart, effective immigration enforcement that targets serious criminal aliens who present the greatest risk to the security of our communities, such as those charged with or convicted of homicide, rape, robbery, kidnapping, major drug offenses and threats to national security. ICE also prioritizes the arrest and removal of those who game the immigration system including immigration fugitives or those criminal aliens who have been previously deported and illegally re-entered the country. Also available in high definition.

## MORE LIKE THIS

## CONTROLLED VOCABULARY KEYWORDS

*No keywords found.*

## TAGS

ICE
U.S. Immigration and Customs Enforcement
Deportation
Criminal Alien Arrests
high definition
ERO
Operation Cross Check
Enforcement Removal Operations

## OPTIONS

Download Video
Add to My Albums
Flag/Report Video

